STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 1392

STATE OF LOUISIANA

VERSUS

ANDREW JEROME FRANCIS

*Judgment Rendered:* DEC 1 7 2020

* * * * * * * *

Appealed from the
21st Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Case No. 34750

The Honorable Elizabeth P. Wolfe, Judge Presiding

* * * * * * * *

| | |
|---|---|
| Jane L. Beebe<br>Addis, Louisiana | Counsel for Defendant/Appellant<br>Andrew Jerome Francis |
| Scott M. Perrilloux<br>District Attorney<br>Brett Sommer<br>Assistant District Attorney<br>Livingston, Louisiana | Counsel for Appellee<br>State of Louisiana |

* * * * * * * *

BEFORE: McCLENDON, HIGGINBOTHAM, AND THERIOT, JJ.

**THERIOT, J.**

The defendant, Andrew Jerome Francis, was charged by grand jury indictment with first degree rape, a violation of La. R.S. 14:42(A)(4) (count one), indecent behavior with juveniles, a violation of La. R.S. 14:81(A) (count two), and failure to register and notify as a sex offender or child predator, a violation of La. R.S. 15:542.1.4(A)(1) (count three). He initially pled not guilty on each count. The trial court granted the defendant's motion to sever count three. The defendant proceeded to a trial by jury on counts one and two and was found guilty as charged on both counts.[1] The trial court denied the defendant's motions for new trial, post-verdict judgment of acquittal, and arrest of judgment. The trial court sentenced the defendant to life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence on count one, and twenty-five years imprisonment at hard labor with two years to be served without the benefit of probation, parole, or suspension of sentence on count two, to run concurrently. On count three, the defendant withdrew his former plea, pled no contest, and was sentenced to two years imprisonment at hard labor, to run concurrent with any other sentence being served.[2] The trial court granted the defendant's pro se application for post-conviction relief (PCR) seeking an out-of-time appeal and a counseled motion seeking the same relief.

The defendant now appeals the convictions on counts one and two, assigning as error the sufficiency of the evidence and the non-unanimous jury verdicts. The defendant argues that because of the errors in the proceeding, his convictions and

---

[1] After the verdicts were announced, the trial court conducted an oral polling of the jury. Though not specified as such, we presume that the single oral polling of the members of the jury was reflective of their votes on both counts, with ten members of the jury indicating "Yes" and two indicating "No." Accordingly, both jury verdicts were non-unanimous.

[2] The trial court failed to impose the statutorily-required parole restriction on count three. See La. R.S. 15:542.1.4(A)(1). In instances where statutory restrictions on parole, probation, or suspension of sentence are not recited at sentencing, La. R.S. 15:301.1(A) deems that those required statutory restrictions are contained in the sentence, whether or not imposed by the sentencing court. Moreover, this paragraph self-activates the correction and eliminates the need to remand for a ministerial correction. **State v. Williams**, 2000-1725 (La. 11/28/01), 800 So.2d 790, 799.

sentences on counts one and two should be reversed. For the following reasons, we vacate the convictions and sentences on counts one and two and remand with instructions, and affirm the conviction and sentence on count three.

## STATEMENT OF FACTS

On or about July 3, 2016, the Gonzales Mental Health Unit contacted the Livingston Parish Sheriff's Office (LPSO) regarding allegations that K.S., an eleven-year-old boy, had been sexually assaulted on three separate instances by his great uncle, the defendant.[3] Detective Shawn Lang of the LPSO sex crimes division contacted K.S.'s family members and arranged for K.S. to be interviewed at the Children's Advocacy Center (CAC). In the CAC interview on July 28, 2016, and at trial on October 25, 2017, K.S. stated that the incidents occurred in Denham Springs, where he periodically visited the residence of his grandmother, L.F., after the defendant, L.F.'s brother, began staying there. K.S. stated that he had been "molested" by the defendant and graphically described incidents of abuse that included oral and anal sexual intercourse initiated by the defendant after he started showing K.S. homosexual pornographic videos of male partners engaging in sexual acts.

During the CAC interview, K.S. specifically alleged that during the first incident, the defendant pulled his (K.S.'s) pants down and began "rubbing all over" him and "feeling" him "down there" on his "penis" and "sucking." He further stated that the defendant told him to touch his toes, adding, "and then he put it up my butt," previously specifying, "He put his penis up my butt." He stated that it felt "painful" and that he "didn't like it all." He further stated that he told the defendant, "Please stop, I won't tell nobody."

---

[3] K.S., the alleged victim in this case, was born on August 23, 2004, and as stated, was eleven years old at the time the offenses allegedly occurred. Thus, we will use initials to refer to the alleged victim and his immediate family members. See La. R.S. 46:1844(W).

At trial, K.S. similarly described the first incident, testifying the defendant first put his hand on K.S.'s upper leg and moved his hand higher up K.S.'s leg, as he ultimately began touching K.S.'s genitals and putting his mouth on K.S.'s "stuff" before using baby oil as a lubricant and penetrating K.S. anally with his penis. K.S. indicated that additional incidents consisting of the same type of abuse occurred on two other occasions before he first disclosed the allegations to another child, whom he referred to at trial as his "stepbrother."[4] Despite pleas by K.S. to keep his disclosures a secret, K.S.'s stepbrother immediately told his mother and K.S.'s father about the allegations.

After the CAC interview, the LPSO obtained and executed a search warrant for the residence in Denham Springs where the offenses allegedly took place. The officers also interviewed L.F., at which point she showed them a pornographic video of male partners having sexual intercourse that was downloaded to her cell phone. L.F. turned the phone over to the police. Deputy Brandon Flowers, a LPSO forensic investigator, performed the cell phone extraction in this case. The extraction revealed many visits to pornographic websites, pornographic images, and pornographic videos that had been downloaded and deleted.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number one, the defendant argues that a complete reading of the trial transcript in this case shows that the State failed to meet its burden of proof. The defendant claims his convictions are the result of K.S. not wanting to be labeled or thought of as gay. The defendant notes that it was only after L.F. "outted" K.S. at the family Fourth of July gathering that K.S. alleged that the defendant raped him. The defendant contends that there was no other evidence in support of the allegations. The defendant argues that based on the timeline K.S.

---

[4] As K.S. explained during the CAC interview, his so-called "stepbrother" was the twelve-year-old son of his father's fiancée.

4

recounted, the incidents, including two allegations that he claims were not relayed to the jury, could not have possibly occurred.

The defendant further makes the following specific claims. First, he claims K.S. initially alleged that three incidents occurred while he was at L.F.'s residence for a three-month period, though K.S. had not been at L.F.'s residence for a three-month period prior to July 3, 2016, the purported date of the family gathering and K.S.'s disclosure. Secondly, he claims that on June 23, 2016, the day several videos were downloaded according to Deputy Flowers, he was at work and K.S. and his brother[5] were in possession of L.F.'s phone. Thirdly, he claims that K.S. also blamed his (K.S.'s) brother for the downloaded videos and only "made up the story" about the defendant after being "outted as gay or bisexual." The defendant concludes that by denying the post-trial motions,[6] the trial court failed to hold the State to its burden of proving the elements of the crime beyond a reasonable doubt.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B) (pertaining to

---

[5] Based on the record, K.S. has two biological siblings, a younger brother (who has the same initials as K.S. but will only be referred to herein as K.S.'s "brother") and a younger sister.

[6] We note that the question of the sufficiency of evidence is properly raised by a motion for post-verdict judgment of acquittal. La. Code Crim. P. art. 821. A motion for new trial presents only the issue of the weight of the evidence and is examined under the so-called thirteenth juror standard, under which the trial judge reweighs the evidence. See **State v. Hampton**, 98-0331 (La. 4/23/99), 750 So.2d 867, 879, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); **State v. Edmond**, 2012-0628 (La. App. 1st Cir. 11/14/12), 2012 WL 5506871, at *1 n.2, writ denied, 2013-0060 (La. 5/31/13), 118 So.3d 391. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See La. Code Crim. P. art. 858. Accordingly, the denial of the defendant's motion for new trial based on La. Code Crim. P. art. 851(B)(1) is not subject to review on appeal. The only issue reviewable in this assignment of error is the constitutional issue of sufficiency of the evidence, which was raised in the defendant's motion for post-verdict judgment of acquittal.

5

motions for post-verdict judgment of acquittal based on insufficiency of evidence); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Cockerham**, 2017-0535 (La. App. 1st Cir. 9/21/17), 231 So.3d 698, 703, writ denied, 2017-1802 (La. 6/15/18), 245 So.3d 1035.

Under **Hudson v. Louisiana**, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), the accused may be entitled to an acquittal if the evidence does not satisfy the standard of **Jackson v. Virginia**, supra. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992). On the other hand, if the reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal. See **Hearold**, 603 So.2d at 734; **State v. Major**, 2019-0621 (La. App. 1st Cir. 11/15/19), 290 So.3d 1205, 1209, writ denied, 2020-00286 (La. 7/31/20), 300 So.3d 398.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Legaux**, 2019-0075 (La. App. 1st Cir. 9/27/19), 288 So.3d 791, 794. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder, in order to convict, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

Louisiana Revised Statutes 14:41(A) defines "rape" as the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent. Emission is not necessary, and any sexual penetration,

6

when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime. La. R.S. 14:41(B). Oral sexual intercourse means the intentional engaging in any of the following acts with another person: (1) the touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender; (2) the touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim. La. R.S. 14:41(C). "First degree rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of thirteen years." La. R.S. 14:42(A)(4).[7]

Lack of knowledge of the victim's age shall not be a defense. La. R.S. 14:42(A)(4). First degree rape is a general intent crime. See La. R.S. 14:11; La. R.S. 14:42; **State v. Cutrer**, 2012-2128 (La. App. 1st Cir. 9/17/13), 2013 WL 5288918, at *2, writ denied, 2013-2509 (La. 6/20/14), 141 So.3d 278. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2).

Indecent behavior with a juvenile is defined as the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child's age shall not be a defense. La. R.S.

---

[7] In 2015, the legislature amended the title of La. R.S. 14:42, changing it from "aggravated rape" to "first degree rape." See 2015 La. Acts, No. 184 and 256, § 1. Louisiana Revised Statutes 14:42(E) provides as follows:

> For all purposes, "aggravated rape" and "first degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape."

14:81(A)(1). Indecent behavior with a juvenile also includes the transmission, delivery or utterance of any textual, visual, written, or oral communication depicting lewd or lascivious conduct, text, words, or images to any person reasonably believed to be under the age of seventeen and reasonably believed to be at least two years younger than the offender. La. R.S. 14:81(A)(2).

The word "lewd" means lustful or indecent and signifies that form of immorality which relates to sexual impurity carried on in a wanton manner. It is identified with obscenity and measured by community norms for morality. The word "lascivious" means tending to incite lust, indecent, obscene, and tending to deprave the morals in respect to sexual relations. Indecent behavior with juveniles is a specific intent crime where the State must prove the defendant's intent to arouse or gratify his sexual desires by his actions with a child. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act La. R.S. 14:10(1). **State v. Bedwell**, 2018-0135 (La. App. 1st Cir. 6/21/18), 2018 WL 3080356, at *13, <u>writ denied</u>, 2018-1247 (La. 1/18/19), 262 So.3d 288.

At trial, Detective Lang testified that during the search of L.F.'s residence, the police located baby oil, allegedly used by the defendant on K.S. as a lubricant, in the bathroom on the shelf above the toilet. Regarding the "phone dump" of the cell phone L.F. provided to the police, Deputy Flowers confirmed that pornographic videos were downloaded and saved on the phone. However, Deputy Flowers noted that in some instances he was unable to recover deleted information. As detailed in the extraction report, the extraction revealed many searches for pornographic images, videos, and websites. Deputy Flowers noted that, for example, the user searched for "gay jail sex black and white" and viewed homosexual prison pornography on a known pornographic website within seconds

of the viewing of a mobile weather site to check the weather forecast for Denham Springs. He noted that it appeared that two web browsing sessions were occurring simultaneously, indicating that the user was multitasking. Deputy Flowers also confirmed that the earliest recovered video was downloaded and deleted on June 23, 2016.

K.S. was thirteen years old at the time of the trial. He testified that he lived in Donaldsonville with his mom and two younger siblings. During the summer, K.S. would routinely visit his grandmother L.F. in Denham Springs. K.S. testified that L.F. had several siblings and that he met the defendant the summer of 2016, at the home of one of L.F.'s (and the defendant's) sisters, in Dulac, Louisiana. After K.S. met the defendant in Dulac, the defendant started coming to L.F.'s house in Denham Springs and eventually began staying there. K.S. testified the defendant was nice, he and the defendant got along well, and the defendant would buy K.S. anything that he wanted. For example, K.S. testified that he wanted to attend a Christian camp that summer but was unable to pay for it, and the defendant paid for him to attend the camp.

K.S. further testified that at some point, the defendant "began to get just a little too close." Specifically, K.S. noted the defendant wanted him to sit next to him when they ate, to sleep with him on the sofa before he (the defendant) started sleeping in one of the bedrooms, to watch television with him, and "things like that." K.S. found the defendant's behavior to be odd. K.S. testified that things became uncomfortable when the defendant asked him if he ever watched "porn." K.S. had not seen any porn, did not know what it was, and informed the defendant that he had not seen any before. The defendant told him that if he was interested, he would show him that night. At nightfall, the defendant showed K.S. "[v]ideos of men in jail, gay sex." K.S. added, "men doing things that I wasn't taught to – that's just not what I was told was right." He confirmed that he did not know at the

time that two men could do those kinds of things. K.S. testified that the defendant used his grandmother's phone to show him the videos and that the defendant did so more than once. He noted that his grandmother had two phones, a Galaxy LG ("or something") and a "side government phone," and that the defendant possibly used both phones to show him pornographic videos. The defendant later started working, acquired his own phone, and began showing K.S. videos on his phone as well. K.S. testified that after a while, he began to feel "too uncomfortable" and suspected that the defendant wanted that type of conduct to occur between the two of them.

K.S. noted that things began to escalate and "sooner or later" the defendant touched K.S.'s legs with his hands one night around 11:00 p.m., as they were sitting on the sofa in the living room at L.F.'s house. He noted that L.F. usually went to sleep at 10:00 p.m. and that everyone else in the home was either asleep or in their room at that time. When asked what happened next, K.S. further testified, "He like – the thing started to like pop up out of his pants." He added, "I guess his penis got hard." K.S. stated that he then began "to reject" and the defendant told him to calm down and that this regularly happens to kids like him. He noted that about every twenty seconds, the defendant would move his hand higher up K.S.'s leg and eventually began touching his genitals. K.S. testified that he was uncomfortable and scared at that point because he did not know what the defendant was capable of. He further testified, "After a while he got it to come out of my pants. ... he began to put his mouth area on my stuff." When asked to clarify the word "stuff," K.S. stated, "My genitals." K.S. testified that the conduct escalated as the defendant grabbed K.S.'s hand and put it on his penis. The defendant further retrieved baby oil from the bathroom and put some of it on K.S.'s buttocks before penetrating him anally with his penis. K.S. testified that he did not want the defendant to do that to him and that it felt terrible. When asked if it hurt, K.S.

stated, "Not exactly." He explained that while it "did hurt," he was "more uncomfortable and scared than hurt." He noted that clear white stuff came out of the defendant's penis and that after a while, the defendant cleaned himself and K.S. and told him goodnight.

When asked why he did not tell anyone what happened, K.S. testified, "That night ... I cried in the shower and I asked God, was this normal? ... But I really didn't want to be alive anymore because I didn't understand what was going on, or why it was happening, and what I did to deserve it." K.S. further noted that while he thought it might not happen again, it did later happen again. After the first incident, K.S. went back home, but when his mother asked him if he wanted to go back to his grandmother's house, he agreed as he wanted to be with his grandmother, though he did not want the defendant to be there. However, when he got back to his grandmother's house, the defendant was still there.

When asked to describe the final incident, K.S. stated that it happened at his grandmother's house again, but by then, the defendant had begun sleeping in one of the bedrooms where it occurred that time on the bed. K.S. further described oral sexual acts and anal intercourse that took place in the bedroom, with the defendant again using baby oil on him as a lubricant. He stated, "The stuff came out of his penis again." K.S. was further asked if the defendant tried to "get stuff to come out" of K.S.'s penis, and K.S. replied, "He tried and I guess because I was young, it didn't work. I'm not sure if it did work. But, I'm sure he might've been angry or something. I don't – I'm not sure."[8]

_____

[8] K.S. was not specifically asked at trial to describe the second incident or to provide any additional details regarding the third incident. However, during the recorded CAC interview, which was shown to the jury, K.S. indicated that during the second and third incidents, he was told to penetrate the defendant with his penis and made to perform oral sex on the defendant. K.S. further stated that the defendant "was mad because I wasn't hard." The interview was conducted by Ashley Fuller, who had been a child forensic interviewer at the CAC for over three years. As Fuller noted at trial, non-leading, non-suggestive questions, appropriate for K.S.'s developmental age, were used during the interview. Fuller had interviewed over four hundred children by the time of the trial.

K.S. testified that his stepbrother was the first person who he eventually told about the incidents. He testified that before telling his stepbrother, he tried several times to give hints to his grandmother about the incidents, noting that he did not want to directly tell her what was happening, but wanted her to "pick up" that it was happening. K.S. further testified that he was very depressed and sad at the time, had attempted suicide many times, and that he was told that no one would believe him if he told someone and that the defendant would get into a lot of trouble. He noted that he did not want to get the defendant into trouble since the defendant was buying and giving him a lot of "stuff" and was "doing nothing but good" for him.

As K.S. further testified, one day his dad and "stepmother" confronted him about homosexual pornographic material that his grandmother discovered on her phone. They told him that he could be honest and that they would love him no matter what. K.S. tried to no avail to convince them that he was not gay and was not watching the videos. He later tried to convince his grandmother of the same when he got back to her house. K.S. testified that it really hurt his feelings as he continued to be questioned. His stepbrother heard him while he was in the bathroom crying and persisted until K.S. told him everything that happened to him.

K.S. testified that when his grandmother found out, she "went in defense mode" and called him a liar. K.S. noted that he was still saddened by her disbelief at the time of the trial. K.S. confirmed that his trial testimony and statements made during his CAC interview were completely truthful. When asked during cross-examination if he previously indicated that the incidents occurred once a month for three months, K.S. testified, "I'm not sure." He clarified that he was not specifically sure about the timeline. When specifically asked how many times something like that happened between him and the defendant, K.S. stated, "It happened another time, the last time before I told." When asked if he meant it

12

happened two more times, he responded, "Yeah." Similarly, during the CAC interview, when asked how many times the acts he described occurred, K.S. stated "once a month, it happened for three months."

Regarding his summer schedule and specifically after school ended in 2016, K.S. testified that he would usually spend two or three weeks at his grandmother's house, then go home for about five days, and then go back to his grandmother's house for another two or three weeks. He further confirmed that when he stayed at his grandmother's house, he either slept in his grandmother's bed or in a recliner in her bedroom. K.S. confirmed that he had regular access to his grandmother's phone and that he was allowed to play with it whenever his grandmother was not using it.

Dr. Ellie Wetsman, a child abuse pediatrician at Children's Hospital in New Orleans who estimated that she had examined thousands of juvenile sex abuse victims, performed the physical examination in this case on August 24, 2016. Dr. Wetsman testified that during the incident history portion of the examination, K.S. stated that his uncle had "molested" him, specifically using that word. When Dr. Wetsman asked K.S. to describe what the molestation consisted of, K.S. stated that his uncle placed his genitals in his butt, his uncle asked K.S. to put his genitals in the uncle's butt, that they put their genitals in each other's mouth, and that his uncle masturbated on top of his genitals. Dr. Wetsman testified that her physical examination of K.S. did not reveal anything of significance but noted that K.S. indicated that the incidents occurred about four or five months prior to the examination. Dr. Wetsman diagnosed K.S. with child sexual abuse based on statements by K.S., referred him to a counseling service, and recommended that K.S. be protected from the alleged perpetrator during the investigation.

K.S.'s paternal grandmother, L.F. (the defendant's sister), also testified at trial. L.F. confirmed that she kept K.S. "pretty much" every summer until recently

13

before the trial and stated that they were "really close." She stated that the defendant was one of her eighteen siblings, and that she had not seen him in a long time before discovering in 2014 that he was living at the Mission Church. L.F. testified that she first found out about the allegations in this case on July 3, 2016. She noted that she first saw K.S. and his siblings that summer on May 14, 2016, when she went to their mother's house in Donaldsonville, that she had taken pictures of them that day, and that due to brain damage and memory loss that she suffered in the past, she routinely took pictures and notes to assist her in recalling every day events. She stated that she used her phone, which she noted was either a Galaxy or LG, to take pictures.[9] L.F. stated that the defendant was not with her that day.

L.F. testified that she stayed in Donaldsonville until May 18, 2016, and that her grandchildren spent the night at her house on May 21, 2016, along with their mother. L.F. testified that on May 31, her grandchildren's mother dropped her grandchildren off, and her grandsons stayed until June 3 or 4, 2016. L.F. confirmed that the defendant was there during that time period. She testified that K.S. and his brother slept in her room when they stayed overnight, though K.S. would sometimes sleep in the chair, a recliner, instead of her bed, and that the defendant slept in the "middle room," his own bedroom. She testified that she did not notice any unusual behavior regarding K.S. or the defendant.

L.F. testified that her grandsons stayed with her again that summer from June 21 to June 23, 2016, the day that she brought them with her to a court matter. Further regarding June 23, she noted that she allowed her grandsons to play with her government phone in the car that day before taking them home to Donaldsonville. When questioned about pornographic videos downloaded on her phone on the afternoon of June 23, 2016, L.F. testified that she was in

---

[9] During her testimony at trial, L.F. was allowed to refresh her memory by looking at photographs she purportedly took that summer of 2016.

Donaldsonville at that time and that the defendant was not with her and was working at the time. When she got home that day, she discovered three videos downloaded on her phone, one consisting of "two little boys sitting in a like a director's chair and on the top it says learning about the gay life." She further testified that one of the videos was of a "black man" and a "Caucasian little boy,"[10] later noting, "the man was like on a counter and the little boy ... he had the little boy's head on his thing." Finally, L.F. testified that in the third video, the "man was behind the little boy and the little boy was in front."

When asked what she thought when she saw the videos, L.F. contemplated different possibilities, first mentioning K.S.'s mother's love interest and then stating that she thought K.S. downloaded them. She then stated, "I didn't know what to think," before seemingly suggesting that she suspected that K.S. was gay because he would wear her clothes sometimes. After discovering the videos, she showed them to K.S.'s mother on June 26, 2016, who immediately deleted them. According to her testimony, L.F. also deleted "a couple" of videos before she left, as she did not want K.S.'s parents to "hold that against [her]" or prevent her from seeing her grandchildren.

L.F. further testified that on July 3, 2016,[11] her son (K.S.'s father) had a family gathering at his home in Donaldsonville, that was attended by L.F., her grandchildren, and the defendant. According to L.F., K.S. became angry at the gathering after L.F. questioned him about being "gay" or "a queer" in front of his father and stepbrother and told him that the defendant was moving out because he (K.S.) was gay. L.F. stated that after the confrontation, she left for about twenty minutes and when she returned, she learned of the allegations at issue and accused

---

[10] When later asked if she knew the ages of the people in the video, L.F. stated, "I don't – it's a boy. I know it's a little boy and a man ... I called him little. Teenager." She further stated that the "two little boys" in the director's chair were probably thirteen or fourteen years old, that they were clothed, and that they were having a discussion about it being "okay to be gay."

[11] On re-call, Detective Lang testified that L.F. previously told the police that the family incident occurred on July 14, 2016.

K.S. of lying because he was either "gay or bisexual." When asked what she did after K.S.'s disclosure, L.F. testified, "I left. I told my brother let's get in the car and let's go." She added, "I was so upset. Everybody was drinking, you know, and I got in my car and [the defendant] came with me." When asked who had access to her government phone, L.F. testified, "[K.S.'s brother], me, I let my brother used [sic] it when he first came which was in March ... he returned it to me in April. April 1." She further confirmed that the defendant only had an old "flip phone" that she did not think had video playing capabilities. Finally, L.F. indicated that her son told her that K.S. accused his younger brother, who was seven years old at that time, of downloading the pornographic videos.

As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Further, the testimony of the victim alone is sufficient to prove the elements of the offense. **State v. Clouatre**, 2012-0407 (La. App. 1st Cir. 11/14/12), 110 So.3d 1094, 1100. It is the fact finder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 878, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155.

In this case, K.S. alleged at trial, with specificity, acts of sexual abuse including anal and oral sexual intercourse and exposure to pornographic materials by the defendant when he was under the age of thirteen, wholly consistent with statements K.S. made during the CAC interview and his medical examination. While L.F. testified that she did not believe K.S., K.S. alleged that L.F. was not

16

present in the room when the incidents occurred. Ten of twelve jurors apparently rejected the defendant's hypothesis of innocence that K.S. fabricated the allegations.

We find that based on the circumstances presented, a rational trier of fact could have found that the defendant orally and anally raped K.S., committed lewd and lascivious acts upon the person of and in the presence of K.S. with the intention of arousing or gratifying the sexual desires of K.S. and himself, and/or transmitted to K.S. visual communication(s) depicting lewd or lascivious conduct or images. The resolution of factual matters, which depends upon a determination of the credibility of the witnesses, involves the weight of the evidence, not its sufficiency. See **State v. Lee**, 2010-2164 (La. App. 1st Cir. 6/10/11), 2011 WL 3427144, at *3, writ denied, 2011-1440 (La. 12/16/11), 76 So.3d 1201. Viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of first degree rape and indecent behavior with a juvenile. Thus, the defendant is not entitled to an acquittal in this case. Assignment of error number one lacks merit.

## NON-UNANIMOUS JURY VERDICT

In assignment of error number two, the defendant notes that the verdicts were non-unanimous and contends that this court should review the constitutionality of the verdicts as patent error. The defendant contends that, under the Sixth Amendment, the law is clear the government can only sustain a conviction and sentence at hard labor based upon a unanimous verdict. The defendant argues that in light of **Ramos v. Louisiana**, 590 U.S. ___, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), a conviction premised on a non-unanimous jury vote should readily constitute both a structural and patent error.

17

In the recent decision of **Ramos**, 140 S.Ct. at 1397, the United States Supreme Court overruled **Apodaca v. Oregon**,[12] 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) and held that the right to a jury trial under the Sixth Amendment of the United States Constitution, incorporated against the States by way of the Fourteenth Amendment of the United States Constitution, requires a unanimous verdict to convict a defendant of a serious offense. Thus, the **Ramos** Court declared non-unanimous jury verdicts for serious offenses unconstitutional. The **Ramos** Court further indicated that its ruling should apply to those defendants convicted of felonies by non-unanimous verdicts whose cases are still pending on direct appeal. See **Ramos**, 140 S.Ct. at 1406; see also **Griffith v. Kentucky**, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

Initially, we note that the defendant did not object to the verdict, nor did he challenge the constitutionality of the verdict in the trial court below. However, for cases pending on direct review when **Ramos** was decided, the Louisiana Supreme Court has mandated that appellate courts consider the constitutionality of the verdict on patent error review, whether or not the issue was preserved in the trial court. **State v. Curry**, 2019-01723 (La. 6/3/20), 296 So.3d 1030 (per curiam); **State v. Cagler**, 2018-02015 (La. 6/3/20), 296 So.3d 1017 (per curiam). Further the jury's verdict is part of the pleadings and proceedings that this court must review for errors patent pursuant to La. Code Crim. P. art. 920(2). **State v. Keys**, 328 So.2d 154, 157 (La. 1976); **State v. Anderson**, 2017-0927 (La. App. 1st Cir.

___

[12] Oregon's non-unanimous jury verdict provision of its state constitution was challenged in **Apodaca**. **Johnson v. Louisiana**, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), decided with **Apodaca**, upheld Louisiana's then-existing constitutional and statutory provisions allowing nine-to-three jury verdicts in criminal cases.

18

4/6/18), 248 So.3d 415, 418-19, writ denied, 2018-0738 (La. 3/6/19), 266 So.3d 901.

Secondly, we note that the State filed a brief in this court arguing that the defendant was at fault[13] in failing to timely appeal in this case and that his convictions and sentences were final when **Ramos** was decided, such that the holding in **Ramos** should not be retroactively applied to this case. The State relies on this court's decision in **State v. Patterson**, 572 So.2d 1144, 1147-48 (La. App. 1st Cir. 1990), writ denied, 577 So.2d 11 (La. 1991). In **Patterson**, citing **Griffith v. Kentucky**, the defendant asserted that his claim of racial discrimination in the selection of the jury was governed by the standards enunciated in **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[14] This court disagreed, finding the former standard set forth in **Swain v. Alabama**, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965),[15] which governed prior to **Batson**, applicable to the defendant's appeal in **Patterson**. As further detailed below, we find that the instant case is distinguishable from **Patterson**.

The defendant in **Patterson** was convicted on April 4, 1978, was adjudged a habitual offender, and was sentenced under La. R.S. 15:529.1 on September 7,

---

[13] In arguing that it was the defendant's fault that he lost the right to appeal, the State points to the defendant's counseled motion for out-of-time appeal (filed in addition to his pro se application for post-conviction relief seeking an out-of-time appeal), which states that one of the defendant's relatives informed defense counsel that private counsel would be hired to handle the defendant's appeal. The motion further notes that the defendant's relatives did not in fact hire private counsel and alleges that the trial counsel made an oral motion for appeal, though a written motion and order for a return date were not filed. The minutes show that while the defendant did not appear at the hearing, the trial court ruled in the defendant's favor, granting the motion for out-of-time appeal. The State now contends it is unclear as to whether the State had notice of the hearing on the motion for out-of-time appeal, noting the lack of an evidentiary hearing.

[14] In **Batson**, the United States Supreme Court reexamined the evidentiary burden placed on a defendant who claims that he has been denied equal protection through the State's exercise of peremptory challenges to exclude members of his race. The **Batson** Court held that a defendant could establish a prima facie case of purposeful discrimination on evidence adduced solely from the State's exercise of peremptory challenges at his trial. **Batson**, 476 U.S. at 92-100, 106 S.Ct. at 1720-25. The **Batson** holding was retroactively applicable to all cases pending on direct review or not yet final at the time **Batson** was decided. **Griffith**, 479 U.S. at 328, 107 S.Ct. at 716 (concerning the retroactive application of **Batson**).

[15] Prior to **Batson**, the **Swain** standard placed the burden on the defendant to prove that the State had systematically excluded black people from juries over a period of time. The **Batson** Court rejected the **Swain** standard as a "crippling burden." **Batson**, 476 U.S. at 92, 106 S.Ct. at 1721.

1978. On May 16, 1989, more than ten years after his conviction and sentence became final, the defendant filed a PCR application in the district court requesting an out-of-time appeal, which was granted by the court on October 30, 1989, more than eleven years after the finality of the defendant's conviction and sentence. **Patterson**, 572 So.2d at 1148. Because the defendant in **Patterson** failed to file a motion for appeal in the trial court within fifteen days after the sentence was imposed, his conviction and sentence became final at the moment that time period expired.[16] This court found that the defendant's out-of-time appeal "does not in any way alter the fact that the conviction and sentence became final prior to the decision in **Batson**." **Id**. Moreover, the defendant's 1989 appeal in that case had not yet been filed and was, thus, not pending on direct review in 1986 when **Batson** was decided. This court held, "Hence, because the instant case had become final before the **Batson** decision was rendered, our review of the trial court's denial of defendant's motion for mistrial is governed not by the **Batson** evidentiary standard but, rather, the evidentiary standard [formerly] set forth in **Swain**." **Id**.

We note that this court's ruling in **Patterson** was called into doubt by the U.S. Fifth Circuit Court of Appeals in **Cockerham v. Cain**, 283 F.3d 657, 661-62 (5th Cir. 2002). In **Cockerham**, the defendant filed a habeas petition, challenging his Louisiana convictions of armed robbery, arguing (first asserted in state court in his third PCR application) that the reasonable doubt portion of his jury instruction was constitutionally defective under **Cage v. Louisiana**, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In addressing whether the defendant could benefit from the ruling in **Cage** in the context of an out-of-time appeal, the **Cockerham**

---

[16] Prior to amendment by 1982 La Acts, No. 143, La. Code Crim. P. art. 914 imposed a fifteen-day requirement for filing a motion for appeal. Thus, at the time the defendant in **Patterson** was sentenced, Article 914 provided a fifteen-day time delay to file an appeal.

court considered the Louisiana Supreme Court's decision in **State v. Fournier**, 395 So.2d 749 (La. 1981), as follows.

The defendant in **Fournier** was convicted of simple burglary in 1973. Prior to his conviction, the Louisiana Supreme Court extended the statutory presumption of La. R.S. 15:432 "that the person in the unexplained possession of property recently stolen is the thief" to the crime of simple burglary. Later, however, in **State v. Searle**, 339 So.2d 1194, 1206 (La. 1976), the Louisiana Supreme Court held that the judicial extension of the statutory presumption to the crime of simple burglary was unconstitutional. The defendant in **Fournier** failed to timely appeal his conviction. However, after **Searle** was decided, he obtained an out-of-time appeal. The **Fournier** court noted that it had previously "held that the rule of **Searle** was applicable to those cases not yet final prior to that decision where timely objection has been made." The **Fournier** court then held, "However, this case is now before us as an out-of-time appeal and therefore defendant's conviction was not final prior to our decision in **Searle**."[17] **Fournier**, 395 So.2d at 750.

As also observed by the **Cockerham** court, in **State v. Counterman**, 475 So.2d 336 (La. 1985), the Louisiana Supreme Court characterized an out-of-time appeal as a "reinstatement of [the defendant's] right to appeal." **Counterman**, 475 So.2d at 340. As the **Cockerham** court further noted, in **State v. Boyd**, 503 So.2d 747 (La. App. 3d Cir. 1987), the Louisiana Third Circuit Court of Appeal concluded that based on the language in **Counterman**, the Louisiana Supreme

_____

[17] In **Fournier**, the dissenting justices disagreed with the majority's conclusion that "an out-of-time appeal can affect the finality of the trial court's judgment." **Fournier**, 395 So.2d at 750-51. Justice Chiasson's dissent noted that the failure to timely appeal within the delay provided in La. Code Crim. P. art. 914 rendered the judgment of the trial court final. **Fournier** predates the legislature's 1990 enactment of La. Code Crim. P. art. 930.8, allowing a defendant to file an application for post-conviction relief, including applications which seek an out-of-time appeal, within three years of the judgment of conviction and sentence becoming final under the provisions of Article 914 (the time period for filing an application for post-conviction relief was later reduced to two years by 1999 La. Acts, No. 1262, § 1). Article 930.8, which expressly allowed a grace period of one year to file for post-conviction relief for felons convicted before the passage of the law, was newly enacted at the time of this court's decision in **Patterson**.

Court "intended to treat an out-of-time appeal as if it had been timely filed, especially since the trial court is not required to grant an out-of-time appeal." **Boyd**, 503 So.2d at 750.[18]

Compelled by **Fournier** (as well as **Counterman** and **Boyd**), the **Cockerham** court concluded that the Louisiana Supreme Court would not consider Cockerham's conviction final until after his out-of-time appeal was resolved. **Cockerham**, 283 F.3d at 661-62. In contrast, the **Cockerham** court cited **State v. Johnson**, 598 So.2d 1288, 1292 (La. App. 4th Cir. 1992), for "refusing to apply a state rule established before the defendant's second out of time appeal was resolved" and this court's decision in **Patterson**, for "refusing to apply **Batson v. Kentucky** ... notwithstanding that the defendant's out[-]of[-]time appeal was resolved after **Batson**." **Cockerham**, 283 F.3d at 661.

In the instant case, the defendant was convicted on September 29, 2017, and sentenced on November 27, 2017. The defendant did not file a motion to reconsider sentence and failed to seek an appeal within thirty days of being sentenced. Thus, the defendant's convictions and sentences became final on December 28, 2017. See La. Code Crim. P. art. 914. However, the defendant timely filed a pro se PCR application in the trial court requesting an out-of-time appeal on October 10, 2018, and the appeal was granted by the court on October 15, 2018. See La. Code Crim. P. art. 930.8(A). The subsequent counseled motion for out-of-time appeal was granted on December 6, 2018. After repeatedly extending the return date, the defendant's appeal was lodged in this court on October 23, 2019. Unlike the defendant in **Patterson**, who sought to apply the

---

[18] In **Boyd**, the defendant sought to apply the ruling of **State v. Jackson**, 480 So.2d 263 (La. 1985), which, as expressed therein, applied to "all cases which are still subject to direct review by this Court, that is, convictions which have not become final upon first appellate review." **Jackson**, 480 So.2d at 268-69. Holding that the defendant was entitled to relief under **Jackson**, the Third Circuit Court of Appeal stated, "as this appeal is treated as timely filed and since this is the first appellate review of defendant's conviction, **Jackson**, supra, applies." **Boyd**, 503 So.2d at 750.

decision in **Batson** that was rendered well before his appeal was filed and decided, the defendant's appeal herein was filed and was still pending on direct review in this court when **Ramos** was decided. Thus, we are bound to apply **Ramos** to the defendant's pending appeal. See **Ramos**, 140 S.Ct. at 1406; **Griffith**, 479 U.S. at 328, 107 S.Ct. at 716; **State v. Varnado**, 2020-00356 (La. 6/3/20), 296 So.3d 1051 (per curiam) ("The present matter was pending on direct review when **Ramos v. Louisiana** was decided, and therefore the holding of **Ramos** applies ... Nothing herein should be construed as a determination as to whether that ruling will apply retroactively on state collateral review to those convictions and sentences that were final when **Ramos** was decided.").

Herein, as noted, after the trial court granted the defendant's motion to sever as to count three, the defendant proceeded to a trial by jury on counts one and two. The oral polling of the jury, recorded in the minutes, reveals that ten of the twelve jurors concurred to render the verdicts of guilty as charged on both counts. Pursuant to the decision in **Ramos**, the non-unanimous jury verdicts in this case are unconstitutional and constitute patent error on the face of the record. Accordingly, the defendant's convictions and sentences on counts one and two are set aside, and the case is remanded for a new trial on counts one and two. Finding no reversible patent error with respect to count three, we affirm the defendant's conviction and sentence on that count, to which the defendant pled no contest and does not challenge on appeal.

**CONVICTIONS AND SENTENCES ON COUNTS ONE AND TWO SET ASIDE; CONVICTION AND SENTENCE ON COUNT THREE AFFIRMED; REMANDED WITH INSTRUCTIONS.**